# AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT

I, Evan Ratcliff, being first duly sworn, hereby submit this affidavit in support of criminal complaint and application for an arrest warrant relating to: JEAN ROBERT CASIMIR ("CASIMIR").

I respectfully submit that there is probable cause to believe that between on or about September 1, 2021, and the present, CASIMIR, and others, have engaged in violations of:

1. 18 U.S.C. § 371 (Conspiracy);

2. 50 U.S.C. § 4819 (Export Control Reform Act or "ECRA"); and

3. 18 U.S.C. § 554 (Smuggling).

## AFFIANT BACKGROUND

1. I am a Special Agent of the U.S. Department of Homeland Security, Homeland Security Investigations ("HSI"), and am currently assigned to the Counterproliferation Investigations Group. Including my time as an HSI Special Agent, I have approximately 17 years of law enforcement experience, including prior employment as a Police Officer and Detective with the Round Rock Police Department in Texas. As a requirement for my employment as an HSI Special Agent, I successfully completed a 12-week Criminal Investigator Training Program ("CITP") located at the Federal Law Enforcement Training Center in Glynco, Georgia. At the conclusion of CITP, I completed an additional 15-week HSI Special Agent Training program. As part of my training, I received extensive instruction and have investigative experience in the areas of immigration law, customs law, firearms training, narcotics investigation, sanctions related investigations, export violations, rules of evidence, and interview techniques.

2. The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents, witnesses, and agencies, specifically from

1

the Federal Bureau of Investigation ("FBI"). This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant. It does not set forth all my knowledge, or the knowledge of others, about this matter.

3.      Based on my training and experience and the facts set forth in this affidavit, I respectfully submit that there is probable cause to believe that CASIMIR and others violated 18 U.S.C. § 371 (Conspiracy), 18 U.S.C. § 554 (Smuggling of goods from the United States), and 50 U.S.C. § 4819 (Export Control Reform Act of 2018 or "ECRA").

## LEGAL BACKGROUND
### *The Export Control Reform Act of 2018*

4.      The Export Control Reform Act of 2018 ("ECRA") provides, among its stated policy objectives, that "the national security and foreign policy of the United States require that the export, reexport and in-country transfer of items, and specific activities of United States persons, wherever located, be controlled …." 50 U.S.C. § 4811(2). To that end, ECRA grants the President the authority "to control (1) the export, reexport, and in-country transfer of items subject to the jurisdiction of the United States, whether by United States persons or by foreign persons; and (2) the activities of United States persons, wherever located, relating to" specific categories of items and information. *Id.* § 4812(a). ECRA further grants the Secretary of Commerce the authority to establish the applicable regulatory framework.

5.      Pursuant to that and prior authority, the Department of Commerce's Bureau of Industry and Security ("BIS") reviews and controls the export of certain items, including goods, software, and technologies, from the United States to foreign countries through the Export Administration Regulations ("EAR"). BIS is located in the District of Columbia.

6.      In particular, the EAR restrict the export of items that could make a significant contribution to the military potential of other nations or that could be detrimental to the foreign

2

policy or national security of the United States. The EAR impose licensing and other requirements for certain items to be lawfully exported from the United States or lawfully reexported from one foreign destination to another. Pursuant to ECRA, in particular 50 U.S.C. § 4819(a)(1), "[i]t shall be unlawful for a person to violate, attempt to violate, conspire to violate, or cause a violation of this part or of any regulation, order, license, or other authorization issued under this part," and pursuant to § 4819(b), "[a] person who willfully commits, willfully attempts to commit, or willfully conspires to commit, or aids or abets in the commission of, an unlawful act described in subsection (a) shall" be guilty of a crime.

7. The most sensitive items subject to EAR controls are identified on the Commerce Control List ("CCL"), published at 15 C.F.R. part 774, Supp. No. 1. Items on the CCL are categorized by an Export Control Classification Number ("ECCN") based on their technical characteristics. Each ECCN has export control requirements depending on the destination, end user, and end use.

8. Between March 9, 2020, and May 29, 2024, "[n]on-automatic and semi-automatic firearms equal to .50 caliber (12.7 mm) or less" were controlled under ECCN 0A501.a. Firearms controlled under ECCN 0A501.a were controlled for national security, regional stability, and anti-terrorism reasons, and required a license for export to Haiti.

9. On or about May 30, 2024, an Interim Final Rule changed certain CCL designations for firearms. Therefore, since May 30, 2024, different types of firearms are designated by separate ECCNs and are subject to different controls. Relevant here, firearms are controlled under 0A501, shotguns are controlled under 0A502, semi-automatic rifles equal to .50 caliber or less are controlled under 0A506, and semi-automatic pistols equal to .50 caliber or less are controlled under 0A507. The firearms designated under these ECCNs are all controlled for national security,

3

regional stability, firearms convention, crime control, and anti-terrorism reasons, and therefore still require a license for export or reexport to Haiti. Accordingly, at all times from March 9, 2020, to the present, a license from BIS was required to export any of the above firearms from the United States to Haiti.

10. Pursuant to 18 U.S.C. § 554(a), "[w]hoever fraudulently or knowingly exports or sends from the United States, or attempts to export or send from the United States, any merchandise, article, or object contrary to any law or regulation of the United States, or receives, conceals, buys, sells, or in any manner facilitates the transportation, concealment, or sale of such merchandise, article or object, prior to exportation, knowing the same to be intended for exportation contrary to any law or regulation of the United States" shall be guilty of a crime.

## JURISDICTION AND VENUE

11. This Court has jurisdiction to issue the requested warrant because it is a "court of competent jurisdiction" as defined by 18 U.S.C. § 2711. 18 U.S.C. §§ 2703(a), (b)(1)(A), and (c)(1)(A). Specifically, the Court is "a district court of the United States . . . that – has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i). As discussed more fully below, acts or omissions in furtherance of the offenses under investigation occurred within Washington, D.C. See 18 U.S.C. § 3237. Namely, a license from BIS was required for a person to export the relevant firearms from the United States to Haiti during timeframe alleged. BIS is located in the District of Columbia.

## PROBABLE CAUSE

12. Since at least November 2022, HSI and the FBI, along with other law enforcement partners including the Drug Enforcement Administration and the ATF, have been investigating potential firearms-trafficking activities related to Haiti. Throughout the investigation, the

investigative team has uncovered information indicating that significant amounts of firearms and ammunition were being smuggled from the U.S. to Haiti for resale and/or distribution to the various criminal gangs operating in the country.

13. During this investigation, HSI and the FBI obtained various pictures of firearms located in Haiti. Analysis of the pictures provided investigators the make, model, and serial numbers of a several rifles located in Haiti. Based on my training and experience, I know that each firearm manufactured and sold in the U.S. has a unique serial number which is typically inscribed on the frame of the firearm. The ATF eTrace system allows requesting law enforcement agencies to obtain the last ATF Firearms Transaction Record ("FTR," also known as ATF Form 4473) in which a firearm was officially transferred to an individual buyer. All federally licensed firearms sellers must complete an FTR when selling a firearm to a non-licensee, ensuring that the buyer is legally able to take possession of the firearm. Based on the clear images of weapons described above, the investigative team submitted tracing requests through the ATF eTrace system.

### JEAN ROBERT CASIMIR'S FIREARM SMUGGLING TO HAITI

14. Results from eTrace on two Radical Firearms rifles shown in photographs obtained by the investigative team revealed that they were purchased in October 2023 by an individual named JEAN ROBERT CASIMIR ("CASIMIR"), a naturalized U.S. Citizen originally from Haiti, from a firearms dealer (U.S. Company 1) with a Federal Firearms License near West Palm Beach, Florida.

15. At approximately 6:25pm on August 7, 2024, CASIMIR arrived from Haiti at U.S. Customs and Border Protection ("CBP") passport control at the Fort Lauderdale-Hollywood Airport in Fort Lauderdale, Florida and was referred to CBP's secondary area for additional inspection. CBP and HSI found two electronic devices in CASIMIR's person and luggage: an

Apple iPhone 12 Pro Max cellphone with Serial Number G0PDVZ4L0D42 (Casimir Phone 1) and an Apple iPhone 11 Pro cellphone with Serial Number C39ZR9WAN6XR (Casimir Phone 2). The WhatsApp account for Casimir Phone 1 utilized a Haitian phone number and the WhatsApp account for Casimir Phone 2 utilized a U.S. telephone number.

16. During the secondary inspection, CASIMIR agreed to a voluntary interview with the investigative team. In that voluntary interview, CASIMIR stated he was previously employed as a Haitian National Police ("HNP") Officer and worked in physical protection as the head of security for the Chief of the HNP. CASIMIR stated that, at the time of the interview, he was providing security consulting for clients who travel to Haiti and want an armed security detail. CASIMIR stated that he owned a security company in Haiti and recruited off-duty HNP officers to fill the protection roles and that he was paid in Haitian Gourdes for his armed security work in Haiti.

17. The investigative team asked CASIMIR how many firearms he owns. CASIMIR explained he only keeps a pistol at his house and keeps an additional AR-15 rifle at his cousin's home because his wife does not like having firearms in their apartment.

18. The investigative team then asked CASIMIR about his purchase of two AR-15s in October of 2023, the two rifles displayed in photographs obtained by the investigative team and referenced above in paragraph 17. CASIMIR stated that immediately following the purchase of the two firearms, he drove them to the house of a friend who agreed to hold the firearms for CASIMIR. CASIMIR stated that he left for a trip to Port-au-Prince immediately afterward and, during his trip away in November 2023, his friend died in a motorcycle crash in Florida in and he never recovered those two firearms. Later in the interview, CASIMIR admitted that he intended to smuggle the firearms to Haiti and would have done so had they not been lost.

6

19. CASIMIR told the investigative team that he purchased approximately four firearms from U.S. Company 1 since the beginning of 2024.

20. CASIMIR further admitted he smuggled firearms on approximately four or five occasions from the United States to Haiti. CASIMIR explained that he would package the firearms in boxes and deliver the boxes to crew members of a cargo boat crew operating between Miami and Haiti. Once the boat arrived in Haiti at the Port de Miragoane, CASIMIR's associate would retrieve the firearms and transport them to his (CASIMIR's) security company's office in Port-au-Prince.

21. CASIMIR admitted he knew there was a firearms embargo to Haiti and admitted he knew it was illegal to smuggle the firearms to Haiti. CASIMIR denied selling firearms to gang members but provided an explanation about how some of his firearms ended up with Haiti street gangs. According to CASIMIR, an employee of his was attacked by a gang while transporting firearms and several firearms were stolen by the gang during this robbery.

**CASIMIR'S FIREARMS PURCHASE HISTORY**

22. The investigative team obtained CASIMIR's purchase history from U.S. Company 1 via legal process, which included approximately 30 completed FTRs. The FTRs showed that between October 2021 and May 2024, CASIMIR purchased at least 87 firearms from U.S. Company 1, including rifles, pistols, and shotguns of various makes and models. The majority of the FTRs show CASIMIR purchasing multiple firearms during a single transaction, sometimes as many as nine firearms at once. Each FTR was signed by CASIMIR, listed his home address in

Lauderhill, Florida, and CASIMIR answered "Yes" on every form to the question: "Are you the actual transferee/buyer of all of the firearm(s) listed on this form and any continuation sheet(s)?"

| 21. Answer the following questions by checking or marking either the "yes" or "no" box to the right of the questions: | Yes | No |
|---|---|---|
| a. Are you the actual transferee/buyer of all of the firearm(s) listed on this form and any continuation sheet(s) (ATF Form 5300.9A)? **Warning: You are not the actual transferee/buyer if you are acquiring any of the firearm(s) on behalf of another person. If you are not the actual transferee/buyer, the licensee cannot transfer any of the firearm(s) to you.** Exception: If you are only picking up a repaired firearm(s) for another person, you are not required to answer 21.a. and may proceed to question 21.b. | X | |

*Excerpt from an ATF FTR form signed by CASIMIR in May 2024*

23.      In addition to the question referenced above, the top of each FTR, which CASIMIR signed at least 30 times in his transactions with U.S. Company 1, provides a disclaimer explaining: "Any person who exports a firearm without proper authorization from either the Department of Commerce or the Department of State, as applicable, is subject to a fine of not more than $1,000,000 and up to 20 years imprisonment."

**WARNING:** The information you provide will be used to determine whether you are prohibited by Federal or State Law from receiving a firearm, or whether Federal or State Law prohibits the sale or disposition of a firearm to you. Certain violations of the Gun Control Act, 18 U.S.C. § 921 et. seq., are punishable by up to 15 years imprisonment and/or up to a $250,000 fine. Any person who exports a firearm without a proper authorization from either the Department of Commerce or the Department of State, as applicable, is subject to a fine of not more than $1,000,000 and up to 20 years imprisonment.

*Excerpt from an ATF FTR form signed by CASIMIR in May 2024*

I certify that my answers in Section B are true, correct, and complete. I have read and understand the Notices, Instructions, and Definitions on ATF Form 4473. I understand that answering "yes" to question 21.a. if I am not the actual transferee/buyer is a crime punishable as a felony under Federal law, and may also violate State and/or local law. I understand that a person who answers "yes" to any of the questions 21.b. through 21.l. as well as 21.n. is prohibited from receiving, possessing, or purchasing a firearm. I understand that a person who answers "yes" to question 21.m.1. is prohibited from receiving or possessing a firearm, unless the person answers "yes" to question 21.m.2. and provides the documentation required in 26.d. I also understand that making any false oral or written statement, or exhibiting any false or misrepresented identification with respect to this transaction, is a crime punishable as a felony under Federal law, and may also violate State and/or local law. I further understand that the repetitive purchase of firearms for the purpose of resale to predominantly earn a profit without a Federal firearms license is a violation of Federal law.

| 22. Transferee's/Buyer's Signature | 23. Certification Date | | |
|---|---|---|---|
| *[signature]* | Month 05 | Day 30 | Year 2024 |

*CASIMIR's signature on an ATF FTR form from May 2024*

24.      Accordingly, the purchase records from U.S. Company 1 directly contradict CASIMIR's statement to HSI that he only purchased four firearms from U.S. Company 1. The records show the purchase of at least 87 firearms over the course of at least 30 separate

8

transactions, of the type that generally match the firearms in the photographs law enforcement has viewed of the weapons in Haiti.

### EVIDENCE OF UNLAWFUL FIREARMS EXPORTS ON CASIMIR'S CELLPHONES

25. Based on the secondary inspection and CASIMIR's voluntary statements, HSI Special Agents determined they would detain CASIMIR's telephones and continue the manual border search of the cellphones to ensure compliance with the laws HSI enforces at the border, including evidence of smuggling. During the manual review, HSI Special Agents found numerous pictures of firearms and conversations surrounding the sale of firearms. On October 1, 2024, The Hon. Zia M. Faruqui, U.S. Magistrate Judge for the U.S. District Court for the District of Columbia, issued a search warrant to search and seize the contents of CASIMIR's cellphones.

26. Shortly after, HSI Special Agents executed the warrant and obtained a forensic image of the two devices for evidentiary review by the investigative team. Both Casimir Phone 1 and Casimir Phone 2 utilized the same Apple iCloud account, so a majority of the phone contacts and media from each device were synced to the same iCloud account. However, as described above, both devices used different telephone numbers.

27. The investigative team reviewed the contents of CASIMIR's phones and uncovered significant numbers of photos, videos, audio recordings, and text messages relating to the purchase of firearms in the U.S. and the sale of firearms in Haiti. The following section lays out pertinent excerpts from the investigative team's analysis relevant to CASIMIR's firearms procurement and trafficking activity.

*CASIMIR's Communications with U.S. Company 2*

28. Emails were present on Casimir Phone 1 from U.S. Company 2, an internet-based firearms manufacturer and firearms parts distributor. These emails were from May and June 2024 and confirmed two separate orders in which CASIMIR purchased a total of six AR-15 style upper receiver assemblies. The emails show the orders were placed in CASIMIR's name and shipped to his residential address of 4212 Inverrary Blvd Apt 85A, Lauderhill, Florida 33319. CASIMIR received subsequent FedEx delivery confirmation emails which appear to show U.S. Company 2's packages pictured at the doorstep of his residence.

29. The order confirmation emails from U.S. Company 2 contain an export control disclaimer paragraph stating the following:

> These items are controlled by the U.S. Government and authorized for export only to the country of ultimate destination for use by the ultimate consignee or end-user(s) herein identified. They may not be resold, transferred, or otherwise disposed of, to any other country or to any person other than the authorized ultimate consignee or end-user(s), either in their original form or after being incorporated into other items, without first obtaining approval from the U.S. government or as otherwise authorized by U.S. law and regulations.

### *CASIMIR's Communications with U.S. Person 1*

30. Casimir Phone 1 also contained WhatsApp conversation between CASIMIR and U.S. Person 1, who utilized a U.S.-based telephone number. The conversation took place between July 2020 and May 2024, and contained approximately 1,099 text, audio, photo, and video messages. A similar conversation also exists between CASIMIR and U.S. Person 1 on Casimir Phone 2.

31. The messages exchanged show U.S. Person 1 advertising numerous different pistols and rifles for sale to CASIMIR[1], and other instances of CASIMIR proactively asking U.S.

---

[1] U.S. Person 1 also advertised to CASIMIR the sale of body armor and night vision devices, which are also controlled for export to Haiti, but there is not evidence of CASIMIR purchasing those items.

Person 1 for firearms. There are extensive discussions of prices, which are typically followed by coordination of an in-person meeting between the two, presumably to pick up the firearms. U.S. Person 1 provided payment instructions to CASIMIR to utilize Zelle or CashApp, and the messages also indicate that CASIMIR used his adult son to deliver cash payments to U.S. Person 1 for firearms on at least one occasion.

32. Publicly available records and social media show that U.S. Person 1 is an employee of U.S. Company 3, a major U.S.-based firearms manufacturer. Records do not reflect that U.S. Person 1 is a Federal Firearms License holder or is properly registered to conduct this volume of firearms sales, which may be in violation 18 U.S.C. § 922(a)(1)(A).

33. In messages exchanged in early March 2023, U.S. Person 1 advertised two Glock pistols and a revolver for sale and CASIMIR stated that he wanted to purchase them. On March 8, 2023, CASIMIR told U.S. Person 1, "I will send a $1000 tomorrow n than (sic) the next day I will send the rest." A few minutes later, CASIMIR forwarded a message to U.S. Person 1 containing a photograph of a computer screenshot showing a French-language money wire transfer confirmation in the amount of $1,000 USD. The screenshot showed the money was sent by Haitian Person 1 and the recipient was listed as U.S. Person 1. CASIMIR then provided Haitian Person 1's Haitian telephone number and told U.S. Person 1, "I will send the rest tomorrow."

34. Haitian Person 1 appears numerous times in CASIMIR's phone extractions and CBP records confirm Haitian Person 1's name and telephone number match the information in CASIMIR's phones. CBP records indicate that Haitian Person 1 entered the United States for the first time on June 3, 2024, which means that Haitian Person 1 would have been outside of the U.S. when he wired the funds to U.S. Person 1 in March 2023.



*Chats between U.S. Person 1 (in blue) and CASIMIR (in green) in which the two discuss the sale of five AR-15 rifles and a Glock pistol*

### CASIMIR's Communications with Haitian Person 2

35. Casimir Phone 1 also contained a WhatsApp conversation with Haitian Person 2, who utilized a Haitian phone number. The conversation took place between August 2020 and August 2024, and contained approximately 248 text, audio, photo, and video messages. As detailed below, CASIMIR sent Haitian Person 2 images of firearms during these exchanges. The backgrounds of the images indicate the images were taken in Haiti. Additionally, CASIMIR

12

advertised the firearms for sale to individuals believed to be in Haiti. Therefore, the context of the images and messages suggests that CASIMIR was selling firearms in Haiti.

36. In August 2020, CASIMIR sent Haitian Person 2 a series of photographs of Glock and Sig Sauer pistols but there are no accompanying messages. In November 2022, CASIMIR sent Haitian Person 2 images of AR-15 style rifles, a Glock pistol, and MAC-10 style pistol. In response, Haitian Person 2 asked CASIMIR for a lower price.

37. In June 2023, CASIMIR sent Haitian Person 2 two videos of two AR-15 style rifles. In response, Haitian Person 2 asked if the "material is still available" and CASIMIR responded that they were not, but there will be more in two weeks.

38. In July 2023, Haitian Person 2 asked CASIMIR for a "G17," presumed to be a Glock 17 pistol. No response from CASIMIR was present in the chat contents.

39. In August 2023, CASIMIR sent Haitian Person 2 photographs of a Smith & Wesson pistol and a Sig Sauer pistol. In response, Haitian Person 2 asked CASIMIR to send the price, and CASIMIR responded by providing a price of "$2600."

40. In November 2023, CASIMIR sent Haitian Person 2 photographs of a Glock pistol with an extended, high-capacity magazine. CASIMIR later sent Haitian Person 2 a price of "$2300."

41. In March 2024, CASIMIR sent Haitian Person 2 an image of four AR-15-style rifles staged on a bed. A logo is visible on the receiver of one of the rifles indicating that it was manufactured by Aero Precision, a U.S.-based firearms manufacturer. Following the photo message, Haitian Person 2 called CASIMIR two times for a total of approximately 5 minutes.

42. Also in March 2024, CASIMIR sent Haitian Person 2 two images of a Heckler & Koch pistol. Following the photo messages, Haitian Person 2 called CASIMIR for 54 seconds.

Approximately two minutes later, CASIMIR sent a message stating "2600," which is believed to be the USD price quotation.

### *CASIMIR's Communications with Haitian Person 3*

43. Casimir Phone 1 also contained a WhatsApp conversation between CASIMIR and Haitian Person 3. who utilized a Haitian phone number. The conversation took place between August 2020 and March 2024, and contained approximately 128 text, audio, and photo messages.

44. In August 2020, the two exchanged several messages which appear to involve Haitian Person 3 buying firearms from CASIMIR on behalf of Haitian Person 3's boss. Haitian Person 3 agrees that he will purchase two Glock pistols and an AR-15 style rifle. CASIMIR quotes "3600" for the rifle and Haitian Person 3 counters with "3000." Following that exchange, Haitian Person 3 sends CASIMIR images of a Unibank wire transfer receipt in which U.S. Person 4 deposited $6,900 USD from their account into another Unibank account. The wire transfer is dated August 29, 2020.

45. In August and September 2020, CASIMIR forwarded several text and photo messages to Haitian Person 3 which appear to be photos of Haitian law enforcement seizing bulk trafficked firearms and ammunition. The forwarded messages, translated to English, stated: "Major seizure of weapons and ammunition at the CPS7 Terminal in Cité Soleil, two people arrested Two people arrested [sic] and a large quantity of weapons and ammunition were found in a container coming from Miami (Florida) this Saturday, August 29, 2020 at Terminal CPS/7 Drouillard, located in the town of Cite-Soleil. These materials were seized by agents of the General Customs Administration (AGD)."

46. In March 2024, CASIMIR sent Haitian Person 3 images of an AR-15 style rifle. The rifle appears to be the same or a very similar model to one that CASIMIR sent photos of to Haitian Person 2 within the same week.

47. Based upon my review of the images of the firearms obtained by the investigative team from CASIMIR's cellphone—including AR-15 style semi-automatic rifles, Glock semi-automatic pistols, a MAC-10 semi-automatic pistol, and a revolver—I know that at all times relevant to this affidavit, a license from BIS would have been required to export each of these firearms from the United States to any end user in Haiti. A review of BIS records reflects that CASIMIR is not listed on any BIS license applications or approved licenses.

### *CASIMIR's Communications with U.S. Person 2*

48. Casimir Phone 1 also contained a WhatsApp conversation between CASIMIR and U.S. Person 2, who utilized a U.S.-based phone number. The conversation took place between November 2020 and August 2024, and contained approximately 2,397 text, audio, and photo messages. The messages include multiple photos of firearms, firearms parts, and references to the purchase and transfer of firearms were exchanged. In March 2022, CASIMIR sent U.S. Person 2 a series of messages asking him to find a 12-gauge shotgun for CASIMIR. Following that message, CASIMIR sent U.S. Person 2 a message with CASIMIR's home address in Lauderhill, Florida.

49. In January 2024, CASIMIR forwarded five separate videos to U.S. Person 2 which cataloged CASIMIR overseeing a crew cutting open the air tanks of two large air compressors in the driveway of what appears to be a residence in Haiti. A U.S.-based company's brand is visible on one of the compressors. The series of videos appears to show that an angle grinder was used to cut the tanks in half. Inside the tanks were duct tape-wrapped packages in the shape of firearms and firearm magazines. The tanks also contained boxes that could contain firearms, ammunition,

magazines, or firearms parts. At one point during the videos, the person recording flipped the camera around to the front-facing camera and revealed CASIMIR's face, indicating he was recording the videos. CBP travel records show that CASIMIR was in Haiti at the time of the recording. Additionally, Casimir Phone 1 also contained a photo dated August 4, 2024. The photo showed a cut-in-half air compressor bearing the same brand as the compressors in the January videos, and the associated metadata indicates it was taken by Casimir Phone 1.





*Still images from the videos showing CASIMIR and the air compressors containing firearms*

***CASIMIR's Communications with U.S. Person 3***

50.     A search for "compressor" in the phone data revealed a conversation on Casimir Phone 1 between CASIMIR and U.S. Person 3, who utilized a U.S. phone number. The conversation ranges between September 2023 and August 2024. Messages in the conversation appear to show that U.S. Person 3 facilitated multiple exports to Haiti on behalf of CASIMIR. In September and December 2023, U.S. Person 3 sent CASIMIR photos of multiple air compressor boxes, the same brand as the U.S.-based company referenced above in paragraph 52. The photos show the boxes being loaded onto a shipping pallet along with other items. In one of the photos, a plastic-wrapped pallet can be seen in front of a sign for U.S. Company 4, a Miami-based shipping company that frequently exports goods to Haiti.



*Photos of air compressors on shipping pallets sent to CASIMIR on December 17, 2023*

51.     On January 4, 2024, U.S. Person 3 sent CASIMIR a voice message, in English and Haitian Creole, containing the following phrase in English: "*This shit is super fucking heavy, man. I ship compressors all the time… let me know what else is in the boxes… how I have to deal with*

17

*this shit?*" In the same message, U.S. Person 3 asks in Haitian Creole if he needs to use discretion and hide things. A few minutes later, CASIMIR responded with a voice message in Haitian Creole explaining that the air compressors have custom motor conversions and are destined for a "project" in Haiti for a group who repairs tires. Four days later, U.S. Person 3 sent CASIMIR an invoice for the shipment of "2 compressor boxes" on a pallet.

### REQUEST TO SUBMIT WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

52.     I respectfully request, pursuant to Rules 4.1 and 41(d)(3) of the Federal Rules of Criminal Procedure, permission to communicate information to the Court by telephone in connection with this Application for an Arrest Warrant. I submit that Assistant U.S. Attorney Kimberly Paschall, an attorney for the United States, is capable of identifying my voice and telephone number for the Court.

## CONCLUSION

53. Based on the forgoing, I submit that there is probable cause that, between at least on or about August 2020 and the present, CASIMIR and his co-conspirators have violated 18 U.S.C. § 371 (Conspiracy), 18 U.S.C. § 554 (Smuggling of goods from the United States), 50 U.S.C. § 4819 (Export Control Reform Act of 2018 or "ECRA"), and 18 U.S.C. § 922(e) (Willful delivery of firearm to common carrier without written notice).

Respectfully submitted,

Evan Ratcliff
Special Agent
Homeland Security Investigations

Subscribed and sworn pursuant to Fed. R. Crim. P. 4.1 and 41(d)(3) on December 16, 2024.

ZIA M. FARUQUI
UNITED STATES MAGISTRATE JUDGE